**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: ____________________ (CIVIL)

FILED BY ___ D.C.
AUG 28 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

JOSEPH MANZARO,
Plaintiff,

v.

SEAN JOHN COMBS a/k/a "DIDDY";
ERIC MEJIAS;
BRENDAN PAUL;
ADRIA SHERI ENGLISH a/k/a ADRIA SHERI MARCEY a/k/a ADRIA SHERI ENGLISH-MARCEY;
SHAWN COREY CARTER a/k/a "JAY-Z";
JOSEPH "BIG JOE" SHERMAN; and
KEITH LUCKS a/k/a "BIG HOMIE CC",
Defendants.

______________________________/

**PLAINTIFF'S VERIFIED COMPLAINT FOR DAMAGES AND JURY DEMAND**

**INTRODUCTION**

1. Plaintiff Joseph Manzaro brings this verified civil action against seven named Defendants: Sean John Combs a/k/a "Diddy"; Eric Mejias; Brendan Paul; Adria Sheri English a/k/a Adria Sheri Marcey a/k/a Adria Sheri English-Marcey; Shawn Corey Carter a/k/a "Jay-Z"; Joseph "Big Joe" Sherman; and Keith Lucks a/k/a "Big Homie CC".

2. Plaintiff alleges that, from April 2, 2015 through April 4, 2015, Defendants participated in, facilitated, benefited from, aided, concealed, or conspired in conduct involving drug-facilitated trafficking, kidnapping-related restraint, false imprisonment, sexual exploitation, sexual battery, physical battery, intimidation, concealment, and related tortious conduct in South Florida.

3. This Complaint is intentionally narrowed. It does not name every person Plaintiff recalls seeing, hearing, encountering, or later identifying. It names as Defendants only those persons Plaintiff alleges had direct, actionable involvement in Plaintiff being abducted, drugged, transported, held, handled, restrained, sexually assaulted, guarded, enforced, concealed, intimidated, or knowingly used as part of the venture described below.

4. Non-party individuals are identified by name within the chronological factual narrative only where Plaintiff alleges their identity is material to chronology, witness testimony, corroboration, record custody, evidence preservation, discovery, victim-witness protection, or possible later amendment. Plaintiff does not presently seek judgment against any non-party unless that person is later properly joined, served, and brought before the Court.

5. Plaintiff pleads direct quotations as the words he recalls or words to that effect. Plaintiff pleads memory-related facts because chemical incapacitation, trauma, delayed discovery, memory fragmentation, intimidation, and concealment are central to timeliness, causation, damages, and discovery.

6. Plaintiff does not allege voluntary participation, consent, agreement, lawful restraint, intoxication by choice, or any consensual sexual act. Plaintiff alleges he was chemically incapacitated, physically controlled, sexually abused, humiliated, threatened, denied truthful emergency intervention, and abandoned without accurate records of what had occurred.

7. Plaintiff seeks compensatory damages, punitive damages where permitted by law, reasonable attorneys' fees under 18 U.S.C. Section 1595 to the extent incurred and recoverable, taxable costs, pre-judgment and post-judgment interest, and trial by jury on all triable issues.

**JURISDICTION AND VENUE**

8. This Court has federal-question jurisdiction under 28 U.S.C. Section 1331 because Counts I through VI arise under 18 U.S.C. Section 1595 and plead the specific Chapter 77 predicate violations identified in each count, including violations of 18 U.S.C. Sections 1589, 1590, 1591, and 1594.

9. Section 1595 authorizes a civil action by a victim of a Chapter 77 violation against the perpetrator and, under its beneficiary-liability clause, against a person who knowingly benefits financially or by receiving anything of value from participation in a venture that the person knew or should have known engaged in a Chapter 77 violation. Counts I through VI separately identify whether each Defendant is alleged to be a direct perpetrator, knowing beneficiary, conspirator, or attempter and the Chapter 77 predicate supporting each theory.

10. This Court has supplemental jurisdiction under 28 U.S.C. Section 1367 over Plaintiff's Florida tort claims because they arise from the same case or controversy as the federal trafficking claim.

11. Venue is proper in the Southern District of Florida under 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Miami-Dade County, Broward County, Palm Beach County, and elsewhere within this District.

12. Personal jurisdiction is proper because Defendants committed acts in Florida, directed acts toward Plaintiff in Florida, used Florida properties, Florida security access points, Florida

transportation routes, Florida communications, and Florida-based participants, and caused injury to Plaintiff in Florida.

13. Plaintiff does not rely on diversity jurisdiction. The federal trafficking claim supplies original jurisdiction, and the Florida tort claims form part of the same nucleus of operative fact.

14. This action seeks damages well in excess of $75,000, exclusive of interest and costs.

## PARTIES

15. Plaintiff Joseph Manzaro is an individual residing in Lake Clarke Shores, Palm Beach County, Florida. Plaintiff was residing at or associated with 424 Valley Forge Road, West Palm Beach, Florida 33405 at the time of the alleged abduction and post-event return.

16. Defendant Sean John Combs a/k/a "Diddy" is an individual who, on information and belief, resides, owns property, conducts business, or maintains substantial contacts in Florida, New York, California, and other jurisdictions. Plaintiff alleges that Combs directed, hosted, maintained, benefited from, and concealed the trafficking and sexual-abuse venture described in this Complaint.

17. Defendant Eric Mejias is an individual residing or operating in Florida. Plaintiff alleges that Mejias acted as a transporter, handler, drugging participant, restrainer, enforcer, custodian, intimidation actor, and post-event threat actor.

18. Defendant Brendan Paul is an individual residing or operating in Ohio and/or Florida. Plaintiff alleges that Paul relayed instructions, coordinated transport and controlled-substance logistics, participated in venture logistics, encouraged the abuse, and was identifiable by distinctive fresh lower-chin fang-style piercings or implants observed by Plaintiff on April 3, 2015.

19. Defendant Adria Sheri English, also known as Adria Sheri Marcey and Adria Sheri English-Marcey, is an individual residing or operating in California and/or Florida. Plaintiff alleges that English acted as a handler, guide, sexual assistant, implement procurer, chemical-exposure participant, and movement facilitator.

20. Defendant Shawn Corey Carter a/k/a "Jay-Z" is an individual who, on information and belief, resides, conducts business, or maintains substantial contacts in New York, California, Florida, and other jurisdictions. Plaintiff alleges that Carter directly participated in Plaintiff's sexual assault while Plaintiff was restrained, drugged, and unable to consent.

21. Defendant Joseph "Big Joe" Sherman is an individual whose full residence is presently unknown to Plaintiff. Plaintiff alleges that Sherman acted as security, enforcement, restraint support, and/or a direct participant in the assaultive environment described below.

22. Defendant Keith Lucks a/k/a "Big Homie CC" is an individual whose current residence is presently unknown to Plaintiff. Plaintiff alleges that Lucks acted as security, enforcement, restraint support, and/or a direct participant in the assaultive environment described below.

## PRIOR TIMELY ACTION, REPRESENTATION BREAKDOWN, AND CURRENT FILING POSTURE

23. Plaintiff previously asserted claims arising from the same core events in Joseph v. Combs et al., Case No. 9:25-cv-80422-DMM.

(a) The prior action was commenced on April 1, 2025, before the alleged ten-year anniversary of the central April 2015 events.

(b) On July 24, 2025, the Court determined that the then-operative pleading constituted an impermissible shotgun pleading and authorized the filing of a corrected Second Amended Complaint by August 8, 2025.

(c) During the period immediately preceding that deadline, an attorney at former counsel's firm represented that the firm was preparing both the corrected pleading and a motion for reconsideration or relief concerning prior service rulings. Neither corrective filing was made before the pleading deadline.

(d) Former counsel's withdrawal was granted on August 8, 2025. Plaintiff received the withdrawal order from the firm on August 11, 2025, after the August 8 pleading deadline had passed. Plaintiff was then required to proceed without counsel while managing PTSD, vasovagal syncope, trauma-related functional limitations, the expired amendment deadline, the pending Rule 11 matter, and an incomplete litigation transition.

(e) On August 12, 2025, Plaintiff filed a notice of pro se appearance, a record-preservation notice, and a Notice of Voluntary Dismissal Without Prejudice. Plaintiff does not contend that he was unaware that the dismissal terminated the action. Plaintiff alleges that he mistakenly believed dismissal without prejudice was a safe means of preserving the underlying claims for corrected refiling without a material limitations consequence. Plaintiff's contemporaneous writings described him as "Pending Refile" and expressly stated that he was not abandoning the underlying claims.

(f) The Court later entered Docket Entry 52, which addressed the prior pleading and prefiling investigation, imposed a $7,500 Rule 11 sanction against former counsel, did not impose a Rule 11 sanction against Plaintiff, closed the prior action, and denied pending matters as moot. Plaintiff does not seek in this new action to vacate or relitigate Docket Entry 52. The present Complaint is separately prepared, materially narrowed, and structured to identify each Defendant, each alleged act, each legal theory, and the evidence or discovery source supporting the allegations.

(g) On July 16, 2026, Plaintiff filed a Rule 60 motion and supporting declaration at Docket Entries 64 and 65. The Court denied that request at Docket Entry 67 on August 11, 2026. This Complaint is filed as a new civil action and does not depend upon the prior action being reopened.

(h) After the prior dismissal, Plaintiff learned that a motion seeking relief for mistake under Federal Rule of Civil Procedure 60(b)(1) was subject to the one-year outer limit stated in Rule 60(c)(1). Plaintiff therefore understood that he needed to complete and file his reopening package before the August 2026 anniversary of the prior dismissal or risk losing that procedural remedy. Plaintiff devoted his available functional capacity to preparing the Rule 60 motion, supporting declaration, proposed verified complaint, proposed order, and conferral materials, and filed that package on July 16, 2026. At that time, Plaintiff did not understand that the one-year Rule 60 period and the limitations period governing a separately commenced civil action operated independently, or that filing a timely Rule 60 motion would not itself suspend or preserve the limitations period for a new complaint. Plaintiff pleads this chronology as evidence of his contemporaneous intent to continue the claims and of continuing diligence, not as a contention that legal misunderstanding alone tolls the statute or that the prior action's filing date automatically transfers to this action.

24. This Complaint names only the seven Defendants against whom Plaintiff presently asserts claims. Nonparty individuals are identified only when a specific observation, statement, access event, chronology point, or record source is material to a pleaded claim or timeliness issue.

25. Plaintiff pleads material facts from personal observation, auditory perception, later-recovered memory, preserved records, or information and belief where expressly stated. Quotations are the words Plaintiff recalls or words in substance.

26. Plaintiff does not attach his complete evidentiary record to this Complaint. Relevant materials will be authenticated and produced, requested, or subpoenaed through the procedures authorized by the Federal Rules of Civil Procedure.

27. Plaintiff does not assert a claim against any nonparty identified in the chronology and does not rely on anticipated discovery to supply an essential fact that he presently lacks.

**ACCRUAL, DELAYED DISCOVERY, AND EQUITABLE TOLLING**

28. Plaintiff did not knowingly, intentionally, or strategically delay reporting these events. Plaintiff alleges that earlier reporting was impossible because he was chemically incapacitated, severely traumatized, medically and psychologically impaired, and left without a complete, usable, or coherent memory of the operative events, identities, locations, sequence, and criminal context.

29. Plaintiff further alleges that his lack of earlier reporting was not ordinary delay. It resulted from the combined effect of chemical incapacitation, trauma-related memory suppression, fragmented recall, continuing fear, intimidation, threats, concealment, false emergency reporting, obstruction, and the failure of others to create truthful medical, emergency, law-enforcement, or incident records at the time of the events.

30. During or shortly after the September 2024 network-news coverage concerning Sean Combs's federal arrest and sex-trafficking-related indictment, Plaintiff viewed video footage depicting the Star Island entrance, a distinctive paver driveway, trees or landscaping positioned near the center of the entrance area, and residential structures that Plaintiff understood to be associated with 1 Star Island and possibly the adjacent 2 Star Island property. Plaintiff recognized those physical features from the April 2015 events. That visual recognition, rather than merely the fact of Combs's arrest, acted as the external sensory trigger that caused the

substantial return and consolidation of Plaintiff's previously fragmented memories concerning the April 2 through April 4, 2015 events. Before that trigger, Plaintiff did not possess a coherent, usable account of the April 2015 locations, sequence, sexual assaults, identities, or Defendant-specific roles sufficient to understand and report the claims alleged in this action.

30(a). Before the September 2024 visual trigger, Plaintiff had recovered and documented memories concerning a separate episode occurring on December 26 through December 27, 2014 involving Mejias, Bony Rivera, Lake Clarke Shores, and Plaintiff's Broward County custody-related matters. Plaintiff alleges that during that earlier episode Mejias and Rivera used the same or a substantially similar salve-like contact method at Plaintiff's Valley Forge Road residence, resulting in Plaintiff's incapacitation and transportation. Plaintiff further alleges that the method was used a second time during the distinct April 2, 2015 abduction alleged below. Plaintiff does not conflate the two incidents. The recovered December 2014 memories did not include the later Deerfield Beach confinement, Star Island locations, sexual assaults, or the identities and roles of the other named Defendants alleged in this action.

30(b). The recovery of specific identities occurred in layers. On or about January 9, 2025, Plaintiff recalled the name Adria English and the earlier exchange in which Mejias identified her. After viewing a photograph, Plaintiff recognized English as the woman he encountered during the April 2015 events.

31. Once those memories returned and Plaintiff understood the operative facts, he acted diligently by seeking medical corroboration, preserving evidence, contacting counsel, documenting witness and record leads, submitting law-enforcement materials, and attempting to file civil claims before the alleged April 2015 ten-year deadline.

31(a). The diligence alleged in paragraph 31 includes Plaintiff's commencement of the prior civil action on April 1, 2025; continued preservation of records and evidence following dismissal; efforts to recover and organize the litigation file; pursuit of professional-accountability remedies concerning former counsel; continued medical, witness, record-custodian, and law-enforcement investigation; preparation of a materially revised pleading by 2026; prioritization and completion of the Rule 60 package before the one-year outer limit Plaintiff understood to govern his mistake-based request for relief; filing of the July 16, 2026 Rule 60 motion; and preparation of this new action following the August 11, 2026 denial of reopening. Plaintiff pleads the prior filing and these subsequent acts as evidence of diligence and continuing pursuit of his rights, not as a contention that the dismissed action automatically tolled the limitations period or transferred its filing date to this new action.

31(b). On January 12, 2026, twenty-seven days after the December 16, 2025 Rico messages, Plaintiff suffered a heart attack seconds after touching his vehicle's door handle while preparing to enter. Because the two prior incapacitation episodes he recalls began with contact at a door handle, the circumstances intensified his fear that he was being targeted. Plaintiff returned inside, collapsed, and his roommate called 911. He was transported by ambulance to JFK Hospital, remained hospitalized for approximately one week, and Lake Clarke Shores assigned Case No. LC26-00100. After discharge, severe fear kept Plaintiff largely confined at home and materially impaired his ability to obtain cardiac follow-up, seek counsel, report threats, organize evidence, and perform sustained litigation work. As he gradually regained limited functioning, he resumed those efforts and made the August 14, 2026 police report concerning the Rico recordings.

31(c). On January 30, 2026, the Department of Justice publicly released records under the Epstein Files Transparency Act. Plaintiff later learned that the release included federal record

EFTA00163098, transmitting a prior victim statement he had submitted to federal authorities concerning separate events. Online reporting identified Plaintiff by name and summarized portions of that statement. Plaintiff alleges that the unexpected public dissemination, while he was recovering from the cardiac event and recent threats, caused severe trauma reactivation and near-total loss of speech for approximately four months, materially impairing his ability to communicate, seek counsel, obtain medical follow-up, report threats, organize evidence, and perform sustained litigation work. Plaintiff gradually regained enough functional capacity to complete the July 16, 2026 Rule 60 filing and the August 14, 2026 police report.

32. Accordingly, Plaintiff pleads that the federal limitations period did not begin to run until the substantial return of coherent memory and discovery of key operative facts in late 2024. Alternatively, Plaintiff pleads that any federal limitations period subject to equitable tolling was tolled by the combined effect of chemical incapacitation, trauma-related memory impairment, intimidation, concealment, obstruction, the documented representation breakdown, the January 2026 cardiac emergency and resulting functional impairment, the subsequent severe trauma reactivation and near-total loss of speech, and the other extraordinary circumstances described in this Complaint.

33. For Counts I through VI, Plaintiff pleads that, for purposes of 18 U.S.C. Section 1595(c), the federal limitations period did not begin to run until the substantial return of coherent memory and discovery of key operative facts in late 2024. Alternatively, Plaintiff invokes federal equitable tolling based on the extraordinary circumstances and diligence alleged in paragraphs 28 through 32.

33(a). If the Court determines that the federal causes of action arose in April 2015 and that the dismissed prior action does not independently preserve the limitations period for this new action,

Plaintiff alternatively invokes federal equitable tolling for the period necessary to account for the extraordinary circumstances and continuing diligence alleged in paragraphs 23 and 28 through 33.

33(b). This alternative federal theory does not rest solely on the pendency of the prior action, ordinary attorney negligence, legal misunderstanding, or Plaintiff's status as a pro se litigant. Plaintiff relies on the combined alleged effect of chemical incapacitation; trauma-related memory impairment and layered recovery; threats and concealment; a timely April 1, 2025 filing; the documented breakdown and abrupt termination of representation during an active amendment and sanctions crisis; the failure to file corrective papers that former counsel's firm had represented were being prepared; receipt of the withdrawal order after expiration of the amendment deadline; Plaintiff's contemporaneously documented intent to continue rather than abandon the claims; Plaintiff's effort to complete the Rule 60 package before the one-year period he understood to govern that remedy; the January 12, 2026 heart attack, hospitalization, severe fear, and home confinement; the subsequent public release and online republication of Plaintiff's prior victim statement, resulting trauma reactivation and near-total loss of speech for approximately four months; and Plaintiff's continued pursuit, as medically and functionally able, of medical, evidentiary, professional-accountability, law-enforcement, Rule 60, and refiling remedies.

33(c). Plaintiff acknowledges that he personally filed the August 12, 2025 dismissal and does not seek in this action to declare that dismissal ineffective or involuntary. The prior-action facts are pleaded solely as part of the federal accrual, equitable-tolling, causation, and diligence analysis applicable to this independently filed action. Plaintiff recognizes that entitlement to equitable

tolling depends upon proof that extraordinary circumstances actually prevented timely maintenance or refiling of the federal claims despite reasonable diligence.

34. For Counts VII through XIII, Plaintiff does not rely on a generalized Florida delayed-discovery rule or on any nonenumerated ground of statutory tolling. Plaintiff invokes Florida Statutes Section 95.051 only to the extent an enumerated statutory ground is established by the facts and proof. Separately, Plaintiff pleads Florida equitable estoppel against a particular Defendant only to the extent that Defendant's own words, acts, affirmative concealment, false emergency reporting, threats, intimidation, or misleading conduct induced Plaintiff to forbear filing within the otherwise applicable limitations period and Plaintiff reasonably relied on that conduct to his detriment. Plaintiff does not contend that equitable estoppel automatically applies to every Defendant.

35. The application of equitable estoppel is Defendant-specific and fact-intensive. Plaintiff alleges that the April 2015 threats and concealment, the false emergency narratives and absence of truthful contemporaneous records, and Mejias's later threats and intimidation are relevant to that inquiry and to Plaintiff's diligence. The December 16, 2025 recordings attributed to Mauricio Rico are pleaded as corroborative evidence of continuing fear and subsequent diligence, but Plaintiff does not allege that any named Defendant directed those calls and does not rely on those calls alone to toll, restart, or extend a Florida limitations period. Plaintiff further pleads his August 14, 2026 report of those recordings to law enforcement, assigned Case No. 26-02030, as objective evidence of diligence in seeking protective and investigative remedies.

## FACTUAL ALLEGATIONS

36. This section summarizes the progression of the alleged trafficking venture from the initial chemical incapacitation and removal on April 2, 2015, through the holding, transport, Star Island

access, assaultive 2 Star Island environment, emergency-response deception, post-event drug route, abandonment, and continuing intimidation. The chronology is pleaded to show the role of each named Defendant and the materiality of non-party witnesses only where their identities directly explain the sequence, records, or discovery path.

### A. Venture Overview

37. Plaintiff alleges that the venture was a common undertaking involving risk and potential profit; operated in or affected interstate commerce through interstate travel, communications, private aviation, and controlled-substance logistics; and used controlled properties, access procedures, handlers, enforcers, sexual assistants, and things of value to obtain, hold, display, exploit, and silence vulnerable persons.

38. Plaintiff alleges that the venture used force, fraud, coercion, restraint, chemical incapacitation, threats, serious harm, humiliation, false reporting, intimidation, and concealment to obtain Plaintiff's compelled labor or services, including forced sexual performance, and to cause Plaintiff to engage in commercial sex acts while maintaining control over him.

39. Plaintiff alleges that the commercial character of the forced sexual conduct was not based merely on attendance at a private event. Plaintiff personally heard English state that Combs had promised her $5,000 for her assigned work that evening as his sexual assistant in connection with the acts being performed on Plaintiff. Plaintiff also alleges that a methamphetamine package was delivered into Paul's backpack as part of the same advance event logistics and role assignment. Plaintiff alleges that the $5,000 promise constituted a thing of value given or promised on account of the forced sexual acts and that the controlled-substance delivery constituted a Defendant-specific benefit tied to Paul's alleged participation in the venture. Plaintiff does not allege that every participant received the same form of value.

40. Plaintiff alleges that Combs operated the overnight April 3 through April 4, 2015 event as a coercive sexual-exploitation environment in which Plaintiff was treated as an object of punishment and domination because he was called a "snitch" and told he would learn what happened to "snitches."

40(a). Before April 2015, Plaintiff had threatened to report conduct involving Mejias and others that Plaintiff believed was connected to Jeffrey Epstein and later reported those matters to the FBI. Plaintiff alleges that the threat to disclose what he knew supplied the context for the "snitch" label and punishment motive. Plaintiff does not seek relief in this action for those separate events.

41. Plaintiff alleges that Mejias acted as the principal transporter, handler, and enforcer who maintained physical and chemical custody of Plaintiff from the initial abduction through the post-event return.

41(a). Based on prior personal dealings, Plaintiff had personally observed Mejias sell, deliver, or arrange cocaine transactions and understood Mejias to be affiliated with the Latin Kings. Plaintiff pleads that background only to explain his recognition of the April 2015 controlled-substance logistics, the coercive significance of Mejias's threats, and Plaintiff's fear of retaliation.

42. Plaintiff alleges that Paul provided logistics, instructions, controlled-substance context, transport-related coordination, and encouragement, and that Paul's distinctive fresh chin piercings anchor his identity and timing.

43. Plaintiff alleges that English acted as an insider handler, guide, assistant, and implement procurer who helped move Plaintiff, prepared Plaintiff for the assaultive environment, and participated in chemical and sexual conduct.

44. Plaintiff alleges that Carter directly participated in sexual assault after seeing Plaintiff restrained, chemically impaired, and unable to consent.

45. Plaintiff alleges that Sherman and Lucks acted as security or enforcement figures who maintained the coercive environment, prevented escape or intervention, and participated in or aided assaultive conduct.

**B. April 2 to April 3, 2015: Chemical Incapacitation, Holding, and Morning Logistics**

46. This subsection addresses the first stage of the alleged venture: Plaintiff's chemical incapacitation, removal from or near his residence, overnight holding at or near Mejias's Deerfield Beach residence, and morning logistics involving Brendan Paul, Damara Holness, controlled substances, and the preparation to move Plaintiff toward Star Island.

47. On or about the night of April 2, 2015, Plaintiff alleges that he was chemically incapacitated and removed from or near 424 Valley Forge Road, West Palm Beach, Florida 33405 without consent.

48. Plaintiff recalls exposure to a salve-like or Vaseline-like substance on a doorknob or contact surface, after which he rapidly lost consciousness or usable control.

48(a). Plaintiff alleges that the April 2, 2015 incapacitation was a separate recurrence of a method previously used against him during the distinct December 26, 2014 episode. Plaintiff does not conflate the two incidents. The December 2014 event led to separate Lake Clarke Shores and Broward County events, while the April 2, 2015 event led to Plaintiff's confinement at Mejias's Deerfield Beach residence and the April 3 through April 4, 2015 Star Island events alleged in this Complaint.

49. Plaintiff alleges that Defendant Eric Mejias and a material non-party participant, Bony Rivera, now deceased, directly participated in removing Plaintiff from the area, transporting him,

and keeping him under strict physical control while Plaintiff was heavily drugged, impaired, and unable to consent.

49(a). Plaintiff recalls regaining partial awareness in the rear seat of Mejias's vehicle during the April 2, 2015 transport, with Mejias driving and Rivera seated in front. Plaintiff recalls Rivera stating in substance that Plaintiff was waking and asking whether Rivera should knock him out. Plaintiff recalls Mejias responding in substance that Rivera should not touch Plaintiff because of DNA and that Mejias had administered Scopolamine. Plaintiff pleads this dialogue as words recalled in substance and as a separate recurrence from the December 2014 episode.

50. Plaintiff alleges that he was held overnight at or near Mejias's residence in Deerfield Beach, Florida, where Mejias maintained complete custody, control, and continuing chemical impairment over him.

51. Plaintiff recalls that during his time held at the Deerfield Beach residence on April 3, 2015, he observed material non-party witness Damara Holness present at or near the property before the subsequent transport to Star Island.

52. At approximately 6:30 a.m. on April 3, 2015, Plaintiff recalls Defendant Brendan Paul arriving at the Deerfield Beach residence on a motorcycle and discussing that Combs wanted Plaintiff brought to the "Freak-Off" that night.

53. Plaintiff recalls Mejias mistakenly calling Paul "Brandon" and Paul correcting him by stating, in substance, that his name was Brendan.

54. Plaintiff recalls Paul noticing that Plaintiff was watching and listening, and Paul questioning why Plaintiff was awake or listening when he was supposed to be asleep.

55. Plaintiff recalls Mejias responding in substance that Plaintiff would not remember anything and would be gone soon.

56. Plaintiff recalls Paul having two fresh silver fang-like piercings or implants protruding from his lower chin area. Plaintiff recalls that the area was fresh, irritated, or oozing, and that Paul requested a napkin or towel to blot it.

57. Plaintiff pleads the distinctive lower-chin piercings as part of his firsthand identification of Paul.

58. Plaintiff recalls Paul stating that a friend associated with a tattoo shop had performed the piercings.

59. Plaintiff recalls Paul stating that he had traveled from Ohio to Florida by motorcycle at unusually high speed and that his parents were away for the weekend. Plaintiff pleads the statement only as a route and timing fact he personally heard.

60. Plaintiff alleges that, after Paul's arrival, Mejias and Paul discussed controlled-substance logistics involving a two-package delivery of approximately one kilogram of cocaine and one kilogram of methamphetamine, that the methamphetamine package was intended for Paul, and that these controlled-substance logistics were part of the same venture and event preparation.

61. After Paul's arrival, Plaintiff heard Mejias call Omar Bravo and say, in substance, that Brendan had arrived and Bravo should bring the packages. Plaintiff later saw Bravo arrive with a driver Plaintiff identifies as Fidencio Robles.

61(a). Plaintiff personally observed Bravo deliver two packages, which Plaintiff understood from the surrounding conversation to contain approximately one kilogram of cocaine and one kilogram of methamphetamine. Plaintiff saw both packages placed into Paul's backpack before Paul departed and heard Paul relay that Combs wanted Plaintiff brought to the Freak-Off that night.

62. Plaintiff alleges that Mejias intentionally maintained continuous chemical control over Plaintiff during April 3 and April 4, 2015, including through Scopolamine, clear-liquid substances, contact sedatives, and other incapacitating substances. Plaintiff later personally heard Mejias identify Xylazine or "Tranq" as a substance used to keep Plaintiff asleep, as described in paragraph 109(a).

63. Plaintiff alleges that he remained fragmented, intermittently conscious, physically compromised, and completely unable to escape, consent, seek help, or preserve a normal memory stream due to this continuous drugging.

### C. Transportation Toward Star Island and Access Through Security

64. This subsection explains the transition from custody at or near Mejias's Deerfield Beach residence to the Star Island access sequence, including the security gate, property access, Christian Casey Combs, Quincy Brown, Gloria Estefan, Emilio Estefan, Jr., English's implement procurement, and the movement toward the Combs-controlled 2 Star Island environment.

65. On or about the evening of April 3, 2015, Plaintiff alleges that Mejias transported him toward Star Island while Plaintiff was chemically impaired, physically controlled, and unable to provide legal consent.

66. At approximately 11:30 p.m. on April 3, 2015, Mejias's vehicle reached the manned Star Island gatehouse. Plaintiff recalls visible security personnel, a pole-mounted camera or camera-like device, identification and access procedures, unusually heavy traffic, and a statement that the group was going to 1 Star Island for an event described as Christian Casey Combs's birthday party. Plaintiff was roused so security could identify him. The vehicle remained at or near the gatehouse for approximately ten minutes and pulled away at approximately 11:40 p.m.

67. Plaintiff was then so chemically impaired that he could barely move and could not speak, but he remained intermittently able to see, hear, recognize people and surroundings, and retain sensory fragments. Plaintiff was not voluntarily attending any party or private event.

68. Plaintiff recalls Quincy Brown communicating with Christian Casey Combs by telephone, intercom, or a similar access system and stating in substance that "they are here to see Dad." Plaintiff recalls Christian thereafter opening, authorizing, or helping permit controlled entry.

69. After entry into the 1 Star Island Drive environment, an unidentified female greeter asked whom Mejias was seeking and how she could help. Mejias stated that Combs was expecting them. The greeter instructed the group to wait, placed a telephone call, and walked away. Plaintiff then observed Paul pass nearby and move toward a group inside the residence.

70. As Plaintiff was slowly pulled or dragged through the 1 Star Island Drive environment in a collar and leash, an unidentified person used a cellphone camera to record him. Plaintiff presently cannot identify the recorder.

71. Plaintiff recalls entering and being moved through a 1 Star Island Drive environment associated with the Estefan family ownership records at that time.

72. In a small service-kitchen area, Plaintiff encountered Christian Casey Combs. Plaintiff pleads that encounter only as an access and chronology fact.

73. Plaintiff personally recognized Taylor Swift among the nonparty attendees. Plaintiff recalls Swift observing him visibly restrained in a collar and leash, asking why he was being held or displayed in that condition, and moving away after hearing that he was being displayed as a "snitch" punishment target. Plaintiff does not allege that Swift participated in Plaintiff's restraint or abuse and identifies her solely as a nonparty eyewitness.

74. Plaintiff recalls a woman he recognized as Gloria Estefan observing his severely compromised condition and calling for immediate medical help. Plaintiff recalls a man he recognized as Emilio Estefan, Jr. redirecting her away. Plaintiff identifies them only as nonparty witnesses and asserts no claim against either.

75. Plaintiff personally heard English tell Mejias that she had traveled approximately five hours, had recently given birth, had experienced substantial difficulty locating a fetish shop from which to obtain a penis mask and a separate approximately fifteen-inch black rubber fist-shaped sexual device, and needed the $5,000. Plaintiff heard English state in substance, "Diddy promised me," referring to Combs's promise to pay her $5,000 for her assigned work that evening as his sexual assistant in connection with the acts being performed on Plaintiff. English stated that she obtained those items at Combs's direction for use at the event. Plaintiff pleads the promised compensation, role assignment, and implement procurement from direct auditory perception and omits any identifying or complete birth-date information concerning English's child.

76. While at 1 Star Island, Plaintiff personally observed Nicolas "Nico" Fanjul remove the headpiece of a full-body dog costume and negotiate with Mejias to purchase three eight-balls of cocaine. Plaintiff heard Mejias initially request $600, Fanjul offer $500, and Mejias accept $500. Plaintiff heard English give Mejias contact information for Jamil Mackey, whom English described in substance as her preferred Miami cocaine supplier, and saw Fanjul and Mejias exchange telephone numbers. As English returned to retrieve Mejias, Rivera, and Plaintiff, Plaintiff heard someone state that it was almost 12:30 and almost time for the Freak-Off to begin. Plaintiff identifies Fanjul and Mackey only as nonparties relevant to the subsequent drug route.

77. At approximately 12:30 a.m. on April 4, 2015, English and Mejias moved Plaintiff from the 1 Star Island Drive environment toward the adjacent 2 Star Island environment controlled by Combs.

78. Plaintiff recalls being moved through a concealed passage or tunnel-like route. He was semi-conscious and dragged on his back for what felt like approximately ten to fifteen minutes while Mejias and English alternated positions at his head and feet. Plaintiff pleads the route as he perceived it and does not purport to establish its architectural configuration without discovery.

**D. Combs-Controlled 2 Star Island Environment**

79. This subsection describes the central assaultive environment at 2 Star Island. It identifies the roles of the named Defendants and places non-party witnesses only where their observations, statements, or records are material to chronology, corroboration, or victim-witness protection.

80. Plaintiff alleges that Defendant Sean John Combs was present inside the 2 Star Island environment and exercised authority over the layout, the event, the participants, the handlers, and the security or enforcement figures.

81. Plaintiff recalls Combs ordering or directing others to get Plaintiff undressed and stating in substance that Plaintiff was a "snitch" and was going to learn what happened to "snitches." Plaintiff alleges that this language was used intentionally to punish, intimidate, and terrorize Plaintiff, and to signal to others that abuse of Plaintiff was authorized.

81(a). In the same controlled environment, Plaintiff recalls Combs displaying approximately ten small pointed plastic vials containing clear liquid and arranging the vials in a circle. Plaintiff heard Combs refer to the vials as "pizza slices" and use the term "pizza party" in connection with Plaintiff's forced undressing, chemical incapacitation, and ensuing sexual abuse. Plaintiff alleges that the staged display and coded terminology were part of the means by which Combs

communicated authority over the participants and directed Plaintiff's continued chemical and physical control.

81(b). Plaintiff recalls Mejias placing liquid from one of the vials into a Sprite or similar lemon-lime beverage and forcing Plaintiff to drink most of it. Plaintiff separately recalls English placing or administering liquid from a vial through a showerhead, shower fixture, or built-in liquid-dispenser mechanism used with baby oil during the shower sequence. Plaintiff alleges that these coordinated administrations further impaired him, prevented resistance or escape, and maintained his availability for the forced sexual conduct.

82. Plaintiff alleges that Mejias, Paul, English, Sherman, Lucks, and others responded to Combs's direction and maintained Plaintiff's physical control, restraint, humiliation, and sexual exploitation.

83. Plaintiff alleges that he was forcibly undressed, restrained, placed in degrading devices or physical restraints, and displayed to attendees while chemically impaired and unable to consent.

83(a). Before the forced display, Plaintiff recalls two unidentified women washing him in a shower area enclosed by a clear curtain and drying him with white towels while Mejias and Rivera watched. Plaintiff was then dressed in degrading clothing and devices while chemically impaired and unable to consent. Plaintiff pleads the unidentified women as potential witnesses and does not presently attribute to them knowledge beyond the conduct he personally observed.

84. Plaintiff alleges that English actively participated in Plaintiff's forced preparation, movement, chemical exposure, humiliation, and subsequent sexual assaultive sequence, including through the procurement and use of implements.

84(a). After portions of the assaultive sequence, Plaintiff recalls Mejias and English confining him in a smaller room on a black leather couch, leaving him unable to leave, and later returning

to redress him before his removal from the property. Plaintiff alleges that this interim confinement and redressing were part of the continuing custody and concealment sequence.

85. Plaintiff alleges that Defendant Brendan Paul actively encouraged the assaultive conduct, including statements in substance encouraging others to show Plaintiff what happened to "snitches."

86. Plaintiff alleges that Defendants Joseph "Big Joe" Sherman and Keith Lucks a/k/a "Big Homie CC" were present as security or enforcement figures during the initial undressing order, the torture-room sequence, and a subsequent pool-table room sequence. Sherman and Lucks helped maintain the coercive environment, prevented escape or third-party intervention, and directly participated in or aided assaultive conduct, including severe abuse involving a pool cue which Plaintiff recalls through trauma-related memory fragments.

87. Plaintiff alleges that the assaultive room operated as a staged, role-assigned environment rather than a spontaneous encounter. Combs directed the sequence; English acted in the compensated sexual-assistant role she had described; Mejias and Rivera acted as custodians and handlers; Paul encouraged the punishment; and Sherman and Lucks maintained security and restraint.

88. During the approximately 12:30 a.m. overnight transition and before the assault, Plaintiff personally recognized Shawn Carter and Beyonce Knowles-Carter. Plaintiff heard Carter state in substance that he had arrived by private jet, was tired or jet-lagged, and had recently finalized a TIDAL-related streaming deal. Plaintiff also heard Carter and Knowles-Carter discuss having been married for seven years and refer to their anniversary as "tomorrow." Plaintiff understood the speakers to be referring to the still-unfolding Friday-night event and the Saturday

anniversary, and pleads the conversation as a firsthand identity and chronology anchor rather than relying on the word "tomorrow" alone to establish the exact minute.

89. Plaintiff alleges that Carter subsequently entered or joined the room where Plaintiff was already restrained, drugged, humiliated, and being actively abused by Combs and English.

89(a). While Plaintiff was in the assaultive room, Plaintiff recalls Carter repeatedly shifting or dodging from side to side across Plaintiff's line of sight. Plaintiff recalls Paul, Sherman, and Lucks making similar repositioning movements from across the room. Plaintiff perceived those movements as efforts to interfere with his ability to observe and later identify them while he was restrained and chemically impaired.

90. Plaintiff recalls two distinct objects used during the assaultive sequence: (a) a large black leather-like gauntlet or glove, worn on the hand and passed among participants; and (b) a separate approximately fifteen-inch black rubber fist-shaped sexual device. Lubricant was used with the gauntlet and the separate device. Plaintiff alleges that Combs initially wore or used the gauntlet to grip and manipulate the separate fist-shaped device and forcibly and repeatedly inserted that device into Plaintiff while Plaintiff was handcuffed, held on all fours, chemically impaired, and unable to consent. The gauntlet itself was not the object inserted into Plaintiff.

91. Plaintiff alleges that, after encouragement by Combs, Carter put on the same gauntlet and used it to grip and manipulate the same separate approximately fifteen-inch black rubber fist-shaped device, forcibly inserting that device into Plaintiff at least twice while Plaintiff remained handcuffed, held on all fours, chemically impaired, and unable to consent. Plaintiff recalls that both Combs and Carter urged Mejias and Rivera to participate despite their expressed reluctance. Plaintiff heard Combs use "snitch" punishment language and heard Carter state to Mejias and Rivera, in substance, "He's your prisoner." Plaintiff understood Carter's statement as an express

acknowledgment that Mejias and Rivera were holding Plaintiff against his will. Plaintiff alleges that Carter mocked Plaintiff during and after his own participation and joined the "snitch" punishment language.

92. During this sequence, Plaintiff recalls material non-party witness Beyonce Knowles-Carter entering the room, observing the assaultive environment, reacting with visible distress, and abruptly leaving the environment.

92(a). After Knowles-Carter left the room, Carter moved to follow her. Before leaving, Plaintiff personally observed Carter hand the gauntlet directly to Mejias. Mejias then wore or used the gauntlet to grip and manipulate the separate fist-shaped device against Plaintiff while Plaintiff remained restrained, chemically incapacitated, injured, and unable to consent or escape. Plaintiff alleges that Carter's acknowledgment of Plaintiff's captivity, encouragement of Mejias and Rivera, personal participation, and direct transfer of the gauntlet to Mejias actively facilitated and maintained Plaintiff's continued control and abuse.

93. Plaintiff alleges that the compensated role assigned to English, the vial-based dosing, the assigned custodial and security roles, the "snitch" punishment directives, and the participants' coordinated responses made the coercive and organized character of the sexual conduct apparent to those who knowingly joined the sequence.

94. Plaintiff alleges that Carter's statement "He's your prisoner," his direction to Mejias and Rivera, his own use of the gauntlet and separate device, and his handoff of the gauntlet to Mejias constituted active maintenance and continuation of Plaintiff's custody, not mere presence.

95. After Plaintiff had been redressed and before removal from the Combs-controlled environment, Plaintiff was in a well-lit office containing a desk. He observed Combs standing in front of the desk and speaking directly with Mejias. Plaintiff heard Combs ask, in substance,

"You're going to be getting rid of him, right?" and heard Mejias respond, in substance, "Yeah, I'll be taking care of that."

96. Plaintiff alleges that the forced display, restraint, sexual abuse, chemical exposure, humiliation, and physical assaults caused catastrophic injury, including permanent sexual maiming, multiple inguinal hernias, disfigurement, internal trauma, chronic pain, and continuing urological and surgical impairment.

**E. Early Morning of April 4, 2015: Emergency Response, False Boat-Crash Narrative, and Removal**

97. At approximately 4:15 a.m. on April 4, 2015, emergency medical responders arrived at or near the waterfront or gazebo area of the property in response to a reported boat crash. Plaintiff saw no boat or boat-crash victims and alleges that the report was used to conceal the true emergency.

98. Plaintiff recalls a responder asking in substance, "Where is the boat?" and Mejias responding in substance that it may have gone down or sunk.

99. Plaintiff recalls a responder observing him and stating in substance that he appeared to need an ambulance or immediate medical attention.

100. Mejias responded in substance that Plaintiff was fine, had merely had too much to drink, and would be watched and cared for. The responder left Plaintiff in Mejias's custody.

101. During the same approximately 4:15 a.m. sequence, Plaintiff recalls English being placed on a stretcher or taken by ambulance while bleeding heavily after a sexual encounter involving Mejias and an implement.

102. Plaintiff personally saw and heard Damara Holness in the parking area rush toward English, act visibly angry, identify English as her friend, and confront and scold Mejias concerning English's bleeding condition.

103. Because people were saying municipal police were on the way, Mejias and others moved quickly to clear the scene. Plaintiff was forced into the rear seat of Mejias's vehicle while suffering from severe sexual injuries, chemical incapacitation, and intermittent consciousness.

104. At approximately 4:30 a.m. on April 4, 2015, after leaving Star Island and while Mejias and Bony Rivera were transporting Plaintiff in the rear seat of Mejias's vehicle en route to obtain cocaine from material non-party Jamil Mackey for later delivery to Nicolas "Nico" Fanjul, Mejias received or participated in a telephone call and placed the call on speakerphone so Rivera could hear it. Plaintiff also heard the entire conversation. Plaintiff recognized the caller as the same woman he had personally seen and heard in the parking lot approximately twenty minutes earlier, where she was visibly confronting and scolding Mejias concerning English's condition. After the call ended, Rivera asked Mejias in substance what the woman's name was, and Mejias responded in substance, "Damara Holness - her father is a commissioner." During the call, Plaintiff heard Holness state in substance that English's injuries were being blamed on Mejias, that English was being transferred or airlifted to Las Vegas, and that English could still die. Plaintiff pleads the identity of the caller and the contents of the call from direct visual and auditory perception, not on information and belief.

**F. Post-Event Controlled-Substance Delivery, Return, and Abandonment**

105. This subsection addresses the post-event route after Plaintiff was removed from Star Island. Plaintiff alleges that Mejias used Plaintiff's incapacitated condition to continue controlled-

substance activity before returning and abandoning Plaintiff without truthful medical or law-enforcement intervention.

106. After leaving Star Island, Mejias and Rivera drove toward Miami to obtain cocaine from Jamil Mackey for delivery to Fanjul while Plaintiff was in and out of consciousness.

107. After the cocaine was obtained, Mejias drove to a Palm Beach County residence associated with Fanjul. Plaintiff remained incapacitated in the vehicle.

108. Plaintiff recalls Mejias delivering three eight-balls of cocaine to Fanjul for the $500 price negotiated earlier at 1 Star Island.

109. Plaintiff recalls Fanjul looking directly at him in the vehicle and telling Mejias, in substance, "You'd better get rid of him."

109(a). After the post-event route and upon returning to Mejias's Deerfield Beach residence, Plaintiff remained physically and chemically impaired. Plaintiff overheard an unidentified person ask Mejias, "How do you keep him asleep like that?" Plaintiff personally heard Mejias answer, "Xylazine, Tranq." Plaintiff did not see and cannot presently identify the person who asked the question. Plaintiff pleads Mejias's response from direct auditory perception.

110. Mejias ultimately drove to and abandoned Plaintiff at or near 424 Valley Forge Road in a critically compromised physical and mental state.

111. No truthful emergency, medical, police, security, or incident record was created at the time to document Plaintiff's status as a drugged, sexually injured trafficking victim, which Plaintiff alleges was a deliberate component of the venture's concealment structure.

**G. Post-Event Injuries, Threats, Concealment, and Damages**

112. This subsection addresses the injuries and concealment consequences that followed the April 2015 events. Plaintiff pleads these facts to connect the alleged conduct to physical and

psychological damages, the federal timeliness theories pleaded in paragraphs 28 through 33, the Florida equitable-estoppel theory pleaded in paragraphs 34 and 35, intimidation, and punitive damages.

113. Plaintiff alleges catastrophic physical injury, including permanent sexual maiming, multiple inguinal hernias, disfigurement, internal trauma, chronic pain, and continuing urological and surgical impairment.

114. Plaintiff alleges severe psychological harm, including PTSD, terror conditioning, fragmented recall, fear of retaliation, vasovagal syncope triggers, isolation, humiliation, anxiety, depression, near-total loss of speech during the early-2026 trauma relapse, and loss of ordinary functioning.

115. Plaintiff alleges that the fear created by the April 2015 events and subsequent threatening incidents continued into the period in which Mejias sent the communications described in paragraph 116.

116. Between 2018 and 2022, Plaintiff alleges that Defendant Mejias engaged in repeated intimidation and threats of physical violence against Plaintiff. On or about September 28, 2022, Plaintiff received Facebook Messenger communications from a profile displaying the name "Chris Brown," which Plaintiff identifies, based on prior personal knowledge and preserved account information, as a profile used by Mejias. The messages stated, among other things, that "witness protection won't even be able to help you," prayed that Plaintiff would not "end up at the bottom of the Hudson River," stated that Plaintiff had "moved the wrong piece and lost before [he] even sat down," referenced Bony Rivera by stating, "Bony died when you accused him of foolishness," and included statements Plaintiff reasonably understood as threats directed at Plaintiff and his minor child, E.G.M. Plaintiff further alleges that surveillance video from

approximately 2020 depicts Mejias trespassing on Plaintiff's private property while attempting to evade visible security cameras. At the time Plaintiff received the 2018 through 2022 communications, Plaintiff understood the references to Bony Rivera in relation to the separate December 2014 episode that Plaintiff had already recovered and documented. Plaintiff did not then possess a coherent memory of the distinct April 2015 Star Island sequence, the sexual assaults, or the identities and roles of the other named Defendants. After the September 2024 visual trigger and subsequent consolidation of memory, Plaintiff understood the broader significance of the intimidation.

117. On December 16, 2025, Plaintiff received three recorded voicemail messages from a caller displayed as an "Unknown number." Based on prior familiarity with Mauricio Rico's distinctive voice, Plaintiff identifies Rico as the speaker. The caller addressed Plaintiff by name, referenced "P Diddy" and Plaintiff's lawsuits, stated in substance that Plaintiff could run but could not hide, and warned that body armor would not protect him. Plaintiff reported the recordings to Officer Concepcion, Badge No. 338, of the Lake Clarke Shores Police Department on August 14, 2026, resulting in Case No. 26-02030. Plaintiff does not allege that a named Defendant directed the calls.

118. After the prior action was filed, Plaintiff observed Facebook activity associated with English that he alleges may bear on a disputed alibi concerning her availability during the April 2015 events. Plaintiff preserves the underlying material for authentication, omits all identifying and complete birth-date information concerning the minor child, and does not rely on the post-filing activity as an independent basis of liability.

119. During the prior action, a nonparty directly contacted Plaintiff's former counsel to assert an alibi for English and warn of public and legal consequences if the action proceeded. Plaintiff

pleads that contact only as part of the post-filing representation-pressure and diligence chronology, does not attribute the nonparty's conduct to any Defendant, and preserves the underlying communications for later use if relevant.

120. Plaintiff alleges economic and compensable losses including medical expenses, future-care expenses, disability-related losses, impairment of earning capacity, security-related damages, and other damages to be proven through discovery and expert testimony.

121. Plaintiff alleges that punitive damages are warranted because the conduct alleged was intentional, malicious, coercive, violent, drug-facilitated, sexually abusive, obstructive, and undertaken with reckless or deliberate disregard for Plaintiff's life, bodily integrity, dignity, and legal rights.

## PRESERVATION OF RECORDS

122. Plaintiff has preserved medical, digital, communication, property-access, emergency-response, law-enforcement, prior-action, and other records relevant to the claims and timeliness issues. Plaintiff will seek appropriate discovery from parties and nonparties in accordance with the Federal Rules of Civil Procedure. Detailed Discovery Objectives and evidence-control materials are maintained separately and are not pleaded as independent claims.

## CAUSES OF ACTION

123. Each count below identifies the Defendant or Defendants against whom it is brought and incorporates only the factual allegations relevant to that claim. No count incorporates prior causes of action wholesale.

**COUNT I: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST SEAN JOHN COMBS a/k/a "DIDDY"**

124. Plaintiff realleges and incorporates paragraphs 1-16, 23-35, 37-40(a), 52-61(a), 65-95, 113-114, and 120-121 as if fully set forth herein.

125. Plaintiff brings Count I under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1589(a), 1590(a), 1591(a)(1), 1594(a), 1594(b), and 1594(c). Plaintiff alleges that Combs is liable as a direct perpetrator, conspirator, and, in the alternative, an attempter.

126. Combs directed that Plaintiff be undressed, restrained, drugged, humiliated, displayed, and sexually abused; displayed and arranged the clear-liquid vials as "pizza slices"; used "pizza party" and "snitch" punishment language; and personally wore or used the gauntlet to manipulate the separate fist-shaped device against Plaintiff. Plaintiff alleges that these acts communicated Combs's authority over the participants and maintained Plaintiff's chemical and physical control.

127. Combs knew or should have known that force, fraud, coercion, chemical incapacitation, restraint, threats, serious harm, and intimidation were being used against Plaintiff.

128. Plaintiff alleges that Combs caused a commercial sex act by promising English $5,000 for her assigned work as his sexual assistant in connection with the forced acts performed on Plaintiff. Plaintiff alleges that Combs's direction, payment promise, role assignment, vial display, personal participation, and control of the event show that he knowingly organized the commercial and coercive conduct.

129. Combs's conduct was a direct and proximate cause of Plaintiff's physical injuries, sexual maiming, trauma, medical damages, economic damages, and emotional distress. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

## COUNT II: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST ERIC MEJIAS

130. Plaintiff realleges and incorporates paragraphs 1-15, 17, 23-35, 40(a)-41(a), 47-63, 65-78, 81-87, 90-95, 97-111, 113-116, and 120-121 as if fully set forth herein.

131. Plaintiff brings Count II under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1589(a), 1590(a), 1591(a)(1), 1594(a), 1594(b), and 1594(c). Plaintiff alleges that Mejias is liable under Section 1595 as: (a) a direct perpetrator of Sections 1589(a), 1590(a), and 1591(a)(1); (b) a conspirator under Sections 1594(b) and 1594(c); and (c), in the alternative to any completed predicate, an attempter under Section 1594(a).

132. Mejias maintained Plaintiff's chemical incapacitation and physical custody, participated in the initial removal and transportation, coordinated controlled-substance and event logistics, forced Plaintiff to consume the vial-containing beverage, moved Plaintiff through the concealed route toward the Combs-controlled environment, received the gauntlet directly from Carter and used it in connection with the separate fist-shaped device, falsely minimized Plaintiff's condition to emergency responders, continued the post-event drug route, and later stated that Xylazine or "Tranq" was used to keep Plaintiff asleep.

133. Mejias knew or should have known that force, fraud, coercion, drugs, restraint, threats, serious harm, and intimidation were being used against Plaintiff.

134. Mejias knowingly obtained, transported, harbored, and maintained Plaintiff for compelled services and commercial sexual exploitation. His acts directly furthered the forced sexual conduct for which English was promised $5,000 and the coordinated punishment directed by Combs.

135. Mejias's conduct was a direct and proximate cause of Plaintiff's damages. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

**COUNT III: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST BRENDAN PAUL**

136. Plaintiff realleges and incorporates paragraphs 1-15, 18, 23-35, 42, 52-61(a), 69, 85, 89(a), 93, 113-114, and 120-121 as if fully set forth herein.

137. Plaintiff brings Count III under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1591(a)(2), 1594(a), 1594(b), and 1594(c). Plaintiff alleges that Paul is liable as a knowing beneficiary, conspirator, and, in the alternative, an attempter. Plaintiff does not rely on Paul personally assaulting Plaintiff.

138. Paul noticed Plaintiff was awake and listening while Plaintiff was supposed to be chemically incapacitated, received the two packages into his backpack, relayed Combs's request that Plaintiff be brought to the event, later encouraged the "snitch" punishment, and repositioned himself across the room in a manner Plaintiff perceived as interfering with observation and identification.

139. Paul knew or recklessly disregarded that force, coercion, chemical incapacitation, and restraint were being used against Plaintiff. Plaintiff alleges that Paul knowingly benefited from participation in the venture by receiving the methamphetamine package placed in his backpack and by obtaining a logistics role tied to the Combs-controlled event.

140. Paul's conduct was a direct and proximate cause of Plaintiff's damages. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

## COUNT IV: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST ADRIA SHERI ENGLISH a/k/a ADRIA SHERI MARCEY a/k/a ADRIA SHERI ENGLISH-MARCEY

141. Plaintiff realleges and incorporates paragraphs 1-15, 19, 23-35, 43, 75-78, 81(b), 83-84(a), 87, 93, 101-104, 113-114, and 120-121 as if fully set forth herein.

142. Plaintiff brings Count IV under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1589(a), 1590(a), 1591(a)(1), 1591(a)(2), 1594(a), 1594(b), and 1594(c). Plaintiff alleges that English is liable under Section 1595 as: (a) a direct perpetrator of Sections 1589(a), 1590(a), and 1591(a)(1); (b) a knowing beneficiary under Section 1591(a)(2) and the beneficiary-liability clause of Section 1595(a); (c) a conspirator under Sections 1594(b) and 1594(c); and (d), in the alternative to any completed predicate, an attempter under Section 1594(a).

143. English participated in Plaintiff's forced preparation, movement, chemical exposure, forced display, confinement, redressing, and sexual humiliation; procured the implements Combs directed her to obtain; and placed or administered clear liquid from a vial through the shower fixture or dispenser.

144. English knew or recklessly disregarded that force, coercion, chemical incapacitation, and restraint were being used against Plaintiff. Plaintiff alleges that English knowingly benefited because Combs promised her $5,000 for her assigned work that evening as his sexual assistant in connection with the forced acts performed on Plaintiff.

145. English's conduct was a direct and proximate cause of Plaintiff's damages. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

**COUNT V: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST SHAWN COREY CARTER a/k/a "JAY-Z"**

146. Plaintiff realleges and incorporates paragraphs 1-15, 20, 23-35, 39, 44, 75, 80-94, 113-114, and 120-121 as if fully set forth herein.

147. Plaintiff brings Count V under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1591(a)(1), 1594(a), and 1594(c). Plaintiff alleges that Carter is liable under Section 1595 as: (a) a direct perpetrator of Section 1591(a)(1) because he allegedly obtained or maintained Plaintiff for a commercial sex act while knowing or recklessly disregarding that force and coercion were being used; (b) a conspirator under Section 1594(c); and (c), in the alternative to any completed predicate, an attempter under Section 1594(a).

148. Carter directly participated in the sexual assault by wearing the gauntlet and using it to manipulate the separate approximately fifteen-inch black rubber fist-shaped device while Plaintiff was handcuffed, held on all fours, and chemically impaired. Carter also repeatedly repositioned himself across Plaintiff's line of sight, urged Mejias and Rivera to participate, stated in substance, "He's your prisoner," and handed the gauntlet directly to Mejias so the sequence could continue.

149. Plaintiff alleges that Carter knew or recklessly disregarded that the conduct was part of an organized commercial sexual venture because he entered a staged, role-assigned environment; observed Plaintiff restrained and maintained by custodians and security personnel; joined Combs's "snitch" punishment; acknowledged Plaintiff as a prisoner; directed Mejias and Rivera to continue; and physically handed the gauntlet to Mejias. The thing of value supporting the commercial-sex-act allegation is Combs's promised $5,000 payment to English for her assigned sexual-assistant role. Plaintiff does not allege that Carter knew the exact amount or personally

received payment; Plaintiff alleges that the surrounding roles and Carter's conduct support knowledge or reckless disregard of the commercial character.

150. Carter's conduct was a direct and proximate cause of Plaintiff's damages. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

**COUNT VI: TVPRA CIVIL LIABILITY UNDER 18 U.S.C. SECTION 1595 AGAINST JOSEPH "BIG JOE" SHERMAN AND KEITH LUCKS a/k/a "BIG HOMIE CC"**

151. Plaintiff realleges and incorporates paragraphs 1-15, 21-22, 23-35, 45, 82-87, 89(a)-94, 113-114, and 120-121 as if fully set forth herein.

152. Plaintiff brings Count VI under 18 U.S.C. Section 1595 based on alleged violations of 18 U.S.C. Sections 1589(a), 1590(a), 1591(a)(1), 1594(a), 1594(b), and 1594(c). Plaintiff alleges that Sherman and Lucks are liable under Section 1595 as: (a) direct perpetrators of Sections 1589(a), 1590(a), and 1591(a)(1) through their alleged maintenance of the security and enforcement structure that restrained Plaintiff and prevented escape or intervention; (b) conspirators under Sections 1594(b) and 1594(c); and (c), in the alternative to any completed predicate, attempters under Section 1594(a).

153. Sherman and Lucks knew or should have known that force, restraint, threats, and intimidation were being used against Plaintiff. Plaintiff alleges that they maintained the coercive environment, prevented escape or third-party intervention, repositioned themselves across the room in a manner Plaintiff perceived as impeding observation and later identification, and directly participated in or aided assaultive conduct as part of the coordinated "snitch" punishment.

154. Sherman's and Lucks's conduct was a direct and proximate cause of Plaintiff's damages. Plaintiff seeks damages and reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595.

**COUNT VII: FALSE IMPRISONMENT AGAINST DEFENDANT ERIC MEJIAS**

155. Plaintiff realleges and incorporates paragraphs 1-15, 17, 28-31 and 34-35, 47-51, 62-63, 77-78, 81(b)-84(a), 90-95, 97-111, 113-116, and 120-121 as if fully set forth herein.

156. Under Florida law, false imprisonment is the unlawful restraint of a person against that person's will and without legal authority.

157. Defendant Mejias intentionally, knowingly, and unlawfully restrained, confined, transported, and detained Plaintiff without consent from the initial April 2 abduction through the Deerfield Beach holding period, Star Island transport, and post-event abandonment.

158. Plaintiff's apparent compliance, if any, resulted from chemical incapacitation, restraint, threats, and inability to escape directly caused by Mejias.

159. As a direct and proximate result of Defendant Mejias's unlawful restraint, Plaintiff suffered physical injury, sexual maiming, emotional distress, and other compensable harm.

**COUNT VIII: FALSE IMPRISONMENT AGAINST DEFENDANT SEAN JOHN COMBS**

160. Plaintiff realleges and incorporates paragraphs 1-16, 28-31 and 34-35, 80-95, 113-114, and 120-121 as if fully set forth herein.

161. Defendant Combs directed, authorized, and maintained the controlled environment at 2 Star Island where Plaintiff was held, displayed, abused, and entirely unable to leave.

162. Combs intentionally and unlawfully confined Plaintiff against his will by ordering him undressed, restrained, and guarded by enforcement figures.

163. As a direct and proximate result of Defendant Combs's unlawful restraint, Plaintiff suffered physical injury, sexual maiming, emotional distress, and other compensable harm.

**COUNT IX: CIVIL BATTERY AND SEXUAL BATTERY AGAINST DEFENDANT SEAN JOHN COMBS**

164. Plaintiff realleges and incorporates paragraphs 1-16, 28-31 and 34-35, 80-96, 113-114, and 120-121 as if fully set forth herein.

165. Plaintiff brings Count IX under Florida common law against Defendant Combs for intentional, harmful, offensive, and non-consensual contact.

166. Combs directed, encouraged, and directly participated in the physical and sexual abuse of Plaintiff, including by displaying the clear-liquid vial system, wearing or using the large black leather-like gauntlet, and using the gauntlet to grip and manipulate the separate approximately fifteen-inch black rubber fist-shaped device against Plaintiff while Plaintiff was chemically incapacitated and restrained.

167. As a direct and proximate result of Defendant Combs's intentional batteries, Plaintiff suffered permanent sexual maiming, multiple inguinal hernias, internal trauma, disfigurement, chronic pain, PTSD, and other compensable harm.

**COUNT X: CIVIL BATTERY AND SEXUAL BATTERY AGAINST DEFENDANT SHAWN COREY CARTER**

168. Plaintiff realleges and incorporates paragraphs 1-15, 20, 28-31 and 34-35, 88-94, 113-114, and 120-121 as if fully set forth herein.

169. Plaintiff brings Count X under Florida common law against Defendant Carter for intentional, harmful, offensive, and non-consensual contact.

170. Carter intentionally engaged in non-consensual sexual contact by wearing the large black leather-like gauntlet and using it to grip and manipulate the separate approximately fifteen-inch black rubber fist-shaped device, forcibly inserting that device into Plaintiff at least twice while Plaintiff was handcuffed, restrained, chemically impaired, and unable to consent. Carter then handed the gauntlet directly to Mejias so the assaultive sequence could continue.

171. As a direct and proximate result of Defendant Carter's intentional battery, Plaintiff suffered permanent sexual maiming, internal trauma, disfigurement, chronic pain, PTSD, and other compensable harm.

## COUNT XI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT SEAN JOHN COMBS

172. Plaintiff realleges and incorporates paragraphs 1-16, 28-31 and 34-35, 80-96, 113-114, and 120-121 as if fully set forth herein.

173. Defendant Combs's conduct, including creating a punishment environment, ordering Plaintiff undressed, humiliating him, sexually maiming him, and utilizing "snitch" intimidation language, was extreme and outrageous and went beyond all possible bounds of decency.

174. Combs intended to cause severe emotional distress or acted with reckless disregard of the likelihood that severe emotional distress would result.

175. As a direct result, Plaintiff suffered severe emotional distress, including PTSD, terror conditioning, memory fragmentation, vasovagal syncope triggers, and loss of ordinary functioning.

**COUNT XII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT ERIC MEJIAS**

176. Plaintiff realleges and incorporates paragraphs 1-15, 17, 28-31 and 34-35, 47-63, 77-78, 81(b)-84(a), 90-111, 113-116, and 120-121 as if fully set forth herein.

177. Defendant Mejias's conduct, including maintaining prolonged chemical incapacitation, falsely minimizing Plaintiff's condition to emergency responders, denying Plaintiff critical medical care, abandoning an incapacitated victim, and engaging in subsequent death threats and trespassing, was extreme and outrageous.

178. Mejias intended to cause severe emotional distress or acted with reckless disregard of the likelihood that severe emotional distress would result.

179. As a direct result, Plaintiff suffered severe emotional distress, terror conditioning, fear of retaliation, and profound psychological injury.

**COUNT XIII: CIVIL CONSPIRACY TO COMMIT TORTIOUS ACTS AGAINST ALL NAMED DEFENDANTS**

180. Plaintiff realleges and incorporates paragraphs 1-15, 15-22, 28-31 and 34-35, 37-45, 52-61(a), 65-78, 80-95, 97-111, 113-116, and 120-121 as if fully set forth herein.

181. Plaintiff brings Count XIII under Florida common law. Plaintiff alleges that Defendants reached an express, implied, or tacit agreement to participate in or facilitate unlawful restraint, battery, chemical incapacitation, commercial sexual exploitation, and concealment. Plaintiff does not infer agreement from mere presence. Plaintiff alleges that the agreement may reasonably be inferred from the advance communications, assigned roles, promised compensation, controlled-substance logistics, staged clear-liquid vial and "pizza party" dosing system, coordinated movement and restraint, common response to Combs's commands, line-of-sight obstruction,

security structure, direct assaultive acts, Carter's acknowledgment that Plaintiff was a "prisoner," the transfer of the gauntlet from Carter to Mejias, the removal directive, the false emergency narrative, and post-event concealment described below.

182. The operational acts supporting the alleged agreement and overt acts in furtherance include the following:

182(a). Combs allegedly requested that Plaintiff be brought to the event; displayed and arranged the clear-liquid vials as "pizza slices"; used "pizza party" and "snitch" punishment language; directed the forced undressing; promised English $5,000 for her assigned sexual-assistant role; used the gauntlet and separate fist-shaped device; and later asked Mejias whether he would be "getting rid of" Plaintiff.

182(b). Mejias allegedly carried out the chemical incapacitation, custody, transportation, controlled-substance logistics, forced administration of the vial-containing beverage, movement between properties, receipt and use of the gauntlet after Carter handed it to him, false explanation to emergency responders, post-event cocaine route, and later intimidation.

182(c). Paul allegedly participated in advance drug and event logistics, received the two packages into his backpack, relayed Combs's request that Plaintiff be brought to the event, traveled ahead toward Star Island, later encouraged the "snitch" punishment, and repositioned himself across the room in a manner Plaintiff perceived as obstructing observation and identification.

182(d). English allegedly traveled to the event, obtained the implements at Combs's direction, accepted Combs's promise of $5,000 for her assigned role, provided Mackey's contact information for the post-event cocaine route, administered vial liquid through the shower fixture

or dispenser, helped move and prepare Plaintiff, participated in the forced sexual conduct, confined and redressed Plaintiff, and was later removed during the emergency sequence.

182(e). Carter allegedly entered after observing Plaintiff's restrained and incapacitated condition, repeatedly repositioned himself across Plaintiff's line of sight, responded to Combs's encouragement, personally used the gauntlet and separate fist-shaped device, urged Mejias and Rivera to participate, stated "He's your prisoner," and handed the gauntlet to Mejias so the assaultive sequence would continue.

182(f). Sherman and Lucks allegedly supplied the security and enforcement structure that maintained Plaintiff's restraint, prevented escape or third-party intervention, repositioned themselves across the room in a manner Plaintiff perceived as obstructing observation and identification, and facilitated or participated in further abuse.

182(g). The alleged common plan was further advanced by the false boat-crash report, the false alcohol explanation given to emergency responders, the rapid removal of Plaintiff after police were reportedly approaching, the speakerphone call concerning English's critical condition, and the post-event cocaine route and abandonment.

183. The conspiracy directly caused Plaintiff's permanent physical injury, sexual maiming, emotional distress, medical damages, and continuing impairment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against the named Defendants, individually and/or jointly and severally where permitted by law, and an award of compensatory damages, including past and future medical and treatment expenses, lost earnings and impairment of earning capacity, physical pain, disfigurement, sexual maiming, emotional distress, humiliation, and loss of enjoyment of life.

Plaintiff requests punitive damages against each Defendant whose conduct satisfies the requirements of applicable Florida law.

Plaintiff requests reasonable attorneys' fees to the extent incurred and recoverable under 18 U.S.C. Section 1595, taxable costs under 28 U.S.C. Section 1920 and other applicable law, and pre-judgment and post-judgment interest as permitted by law.

Plaintiff further requests judgment in an amount to be determined by the jury, including compensatory and punitive damages up to $500,000,000 according to proof and applicable law, together with any other relief the Court may lawfully award.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: AUG 27 2026

Respectfully submitted,

Joseph Manzaro

Joseph Manzaro

7036 Pine Tree Lane

Lake Clarke Shores, Florida 33406

Telephone: (561) 287-0646

Email: JManzEmail@gmail.com

Plaintiff, Pro Se

**VERIFICATION PURSUANT TO 28 U.S.C. SECTION 1746**

I, Joseph Manzaro, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint and that the factual allegations are true and correct to the best of my knowledge, information, recollection, and belief.

Executed on: AUG 2 7 2026

Joseph Manzaro